DONNA R. YOUNG, Plaintiff-Appellee, *v.* GATEWAY TRANSPORTATION COMPANY, INC., *et al.*, Defendants-Appellants.—(JAMES HAMMER, Defendant-Appellee.)

(No. 59605;

First District (5th Division)—February 28, 1975.

Dowd, Dowd & Dowd, of Chicago (Michael E. Dowd and Philip J. McGuire, of counsel), for appellants.

Eugene I. Pavalon, of Asher, Greenfield, Gubbins & Segall, Ltd., of Chicago (Peter B. Carey, of counsel), for appellee Donna R. Young.

McKenna, Storer, Rowe, White & Haskell, of Chicago (Royce Glenn Rowe and Robert S. Soderstrom, of counsel), for appellee James Hammer.

Mr. JUSTICE SULLIVAN delivered the opinion of the court:

In this action, plaintiff sought damages because of injuries suffered in a motor vehicle collision involving a moving automobile operated by James Hammer, in which plaintiff was a passenger, and a standing semitrailer owned by defendant Gateway and operated by its employee, defendant Bowen. Judgment was entered on the jury's verdicts in favor of plaintiff in her claim against Gateway and Bowen, and in favor of Hammer in her claim against him. A third-party complaint by Gateway and Bowen against Hammer for idemnity based on the active-passive theory of negligence was dismissed before the trial.

On appeal, Gateway and Bowen contend that (1) the jury was improperly instructed (a) as to alleged violations of certain statutes and regulations, and (b) as to plaintiff's claim for future medical expenses and loss of earnings; (2) no act or omission on their part was a proximate cause of plaintiff's injuries; (3) the court improperly excluded certain evidence offered by them; and (4) their third-party complaint against Hammer should not have been dismissed. Plaintiff has not appealed from the verdict and judgment in favor of Hammer on her claim against him.

Plaintiff testified that in the late afternoon, she accompanied her mother to a tavern where Hammer was working as a bartender. All three left there about 8 P.M. and went to the Viking Tap where, after about 30 minutes, her mother went home, and she and Hammer stayed until about 10:30 or 11 o'clock. Hammer was driving her to her brother's home when the accident occurred. He was driving south in the curb lane about one car length behind a semitrailer truck, and, when that truck swerved suddenly to the left, she saw another truck stopped along the west curb. She shouted, "It's a truck," and then Hammer's car struck defendants' parked truck. She saw no lights or reflectors on the truck and no flares or lanterns at the rear of the truck.

Hammer testified that he finished his work as a bartender about 7 P.M. and then talked with plaintiff and her mother until about 9 P.M., when all three went to the Viking Tap. Plaintiff's mother left there after about

30 minutes, and about 11 P.M. he offered to drive plaintiff to her brother's home. He was traveling about 30 to 35 miles per hour south on U.S. 51 in the curb lane, about a car length behind a moving semitrailer truck. When that truck swerved to the left, plaintiff shouted, "There's a truck." He then observed for the first time a truck which was stopped in the curb lane. He braked and swung to the left, but the front of his car struck the left rear wheels of the truck. He saw no lights, reflectors, flares or fuses. Hammer also stated that during the 6 years he lived in Rockford, Illinois, he had observed "No Parking at Any Time" signs along the west curb of U.S. 51, in the area of the accident.

Bowen testified he had been employed by Gateway for 7½ years as a driver and, on the night of the accident, he was on a trip to Chicago for Gateway. He was on U.S. 51 in Rockford, Illinois, traveling south, when a buzzer and a red light on the instrument panel indicated a loss of air pressure, which automatically set his brakes. He was in the curb lane and came to a stop in front of Gil's Diner. During the two blocks he had been driving on the highway, he did not notice any "No Parking" signs.

Bowen also stated that before leaving the Rockford terminal, he had checked his equipment and noticed that all lights were working. When he stopped at the curb, he turned on his emergency flashers and went to the phone booth outside of Gil's Diner to call the Waddell Garage. He was in the booth when his truck was struck. The impact broke one corner light, but all the others on the truck were still working. After the arrival of the police, he released the brakes and drove the truck to the Waddell Garage, where a diaphragm from a connection in the air-brake line was replaced. He had flares but did not place them nor reflectors or any other warning indicators at the rear of the truck. He was familiar with Gateway safety bulletins requiring safety equipment, including flares, to be placed at the rear of a truck on a highway.

Bowen stated he had not been in Gil's Diner on the night of the accident. He did know Karline Hunter and saw her at the diner on the night of the accident, but he denied having any conversation with her. He was familiar with the area, but he denied knowing that there were any "No Parking" signs at the west curb, and he was impeached on that point by his deposition testimony that he knew there was no parking at the west and east curbs.

The deposition of Karline Hunter was read into evidence. She was a waitress at Gil's Diner and knew Bowen. On the night of the accident, Bowen parked his truck at the curb just north of the diner. He made no call from the phone booth outside but, instead, came into the diner where he drank coffee for 10 or 15 minutes before the accident occurred. When she heard the impact, she and Bowen ran outside and saw that

an automobile had struck his truck. She noticed no lights burning on the truck, and she stated that the headlights and taillights were not lighted and that no flares were behind the truck.

Bowen told her to say she overheard him call the garage to report brake trouble and not to say he stopped in the diner for coffee. He said he would take "the disc" out of the truck and warned her that, if she wanted her job, she had better cooperate with him. Subsequently, she related to the police what Bowen had told her to say. After the crash, she heard Bowen call the Waddell Garage and say "Come over and get the disc of mine out because I had an accident" and that "I want the broken disc." During the 6 months prior to the occurrence, Bowen had been in the diner three or four times a week.

Opinion

I.

Defendants argue that the trial court committed reversible error in giving certain instructions to the jury regarding alleged statutory violations by defendants. They complain first of plaintiff's instruction No. 28, which addresses itself to the responsibility of illuminating disabled freight-hauling vehicles. This instruction paraphrased the language of the statute (Ill. Rev. Stat. 1967, ch. 95½, par. 218(b)) as follows:

"There was enforced in the State of Illinois at the time of the occurrence in question, a certain statute which provided that:

'Whenever any motor vehicle which is designed and used for pulling or carrying freight is disabled during the period between sunset and sunrise and such motor vehicle cannot immediately be removed from the main travelled portion of a highway outside of a business or residence district, the driver shall cause such flares, lanterns, red reflectors or other signals to be lighted and/or placed upon the highway 100 feet to the rear of the vehicle, and the other upon the roadway side of the vehicle.'

If you decide that a party violated the Statute on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not a party was negligent before and at the time of the occurrence."

Defendants' objection premises on the limitation of this statute to those instances when a freight-hauling vehicle becomes disabled outside of a business or residential district. They contend the instruction should not have been given, because there was testimony that certain mercantile establishments were located in the area of the occurrence. Thus, they say

that the truck was stopped in a "business district," as defined in section 1—106 of the Illinois Vehicle Law and section 16 of the Uniform Act Regulating Traffic on Highways (Ill. Rev. Stat. 1967, ch. 95½, pars. 1—106 and 113(a)), as follows:

> "The territory  *  *  *  contiguous to and including a highway when within any 600 feet along such highway there are buildings in use for business or industrial purposes, including but not limited to hotels, banks, or office buildings, railroad stations, and public buildings which occupy at least 300 feet of frontage on one side or 300 feet collectively on both sides of the highway."

From our review of the record, it does not appear that there were business or industrial establishments occupying 300 feet of highway frontage on one or both sides collectively within any 600 foot area of the highway. There is testimony that the following buildings were on the west side of Highway 51: Gil's Diner, The Sparkle Doughnut Shop, the Waddell White Garage and the Waddell White Service Facility. The testimony indicates the garage is located 100 feet north of the doughnut shop and that the service facility is about 400 feet further north of the garage. However, there is no evidence of any other buildings within the 400 feet between Waddell's garage and its service facility and, although it appears that the buildings span a distance of 600 feet, there is no evidence that they "occupy at least 300 feet of frontage along the highway," as stated in the statute. Furthermore, there is no testimony concerning any buildings on the east side of the highway.

■■ Thus, we believe the record reveals support for plaintiff's position regarding the applicability of the statute and, in the absence of evidence to the contrary, we cannot say that it was error to give this instruction to the jury.

Secondly, defendants claim error in the submission of plaintiff's Instruction No. 27 which, in pertinent part, read: "No person shall park a vehicle at any place where official signs prohibit parking." The language of the instruction comes from section 90(a)14 of the Uniform Act Regulating Traffic on Highways (Ill. Rev. Stat. 1967, ch. 95½, par. 187(a)(14).) Section 1—138 of the Illinois Vehicle Law defines "official traffic-control devices" as:

> "All signs, signals, markings and devices not inconsistent with this act placed or erected by authority of a public body or official having jurisdiction, for the purpose of regulating, warning or guiding traffic."

Specifically, defendants contend that while testimony was introduced establishing the existence of a "No Parking" sign approximately 200 feet north of the occurrence, there was no testimony with respect to when or

by whom the sign was erected or whether the sign was "official." They argue, relying on *City of Chicago v. Myers*, 100 Ill.App.2d 87, 242 N.E.2d 14, that to be official a sign must conform with the specifications of the Manual of Uniform Traffic Control Devices for Streets and Highways, issued by the Illinois Department of Public Works and Buildings, and absent such evidence it was not an official sign, so that the failure to obey it cannot be considered a statutory violation.

In *Myers*, there was uncontradicted testimony as to the size, color and placement of "No Left Turn" traffic signs and testimony that they did not meet the standard or special alternative specifications required by the manual. Thus, in *Myers*, the validity of the sign was in issue, and the court held the signs were not official because the evidence disclosed they were smaller and of a different color than required by the manual.

Here, unlike *Myers*, the manual was not introduced and no testimony was offered that the sign was not official. Inasmuch as plaintiff presented evidence concerning the existence of the sign, without objection and without contradiction as to its official nature, she was entitled to have the jury instructed on this aspect of her case as it concerns the issue of defendant's negligence. We believe there was sufficient evidence in the record to support this instruction. See *Hocking v. Rehnquist*, 44 Ill.2d 196, 203, 254 N.E.2d 515.

■■ Defendants further contend error was committed by giving plaintiff's Instruction No. 29, which quoted a motor-carrier regulation of the Interstate Commerce Commission and Department of Transportation, providing that truck braking systems insure against leaks and defect manifestations. The reason given by Bowen for the stopping of the truck was the failure of its brakes and, when this is considered with his admission that the ability to pump air into the braking system was impaired by the condition of a rubber disc, we believe that there was no impropriety in the giving of this instruction. Furthermore, it does not appear that defendants, at the conference on instructions or in their post-trial motion, asserted the grounds now relied upon as error. They cannot urge specific error for the first time on appeal. (*Saunders v. Schultz*, 20 Ill.2d 301, 170 N.E.2d 163.) Thus, they have waived any error in its submission to the jury. *Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.*, 21 Ill.App.3d 510, 316 N.E.2d 255.

Finally, defendants contend the court erred in giving plaintiff's Instruction No. 18, which allowed the jury to consider future loss of earnings and future medical expenses in determining plaintiff's damages. We believe defendants' position is untenable, as ample evidence was introduced to support this instruction. As to the medical expenses, plaintiff testified she had not been released from Dr. Schrader's care and was required to

continue seeing him on a regular basis. Dr. Richards, her initial orthopedic surgeon, testified that X-rays discovered a hip dislocation which required a metal prosthesis which had limited duration. Dr. Schrader, who performed the hip surgery, stated there was a possibility of infection developing up to 2 years after the surgery, and he placed the life of the hip replacement at somewhere between 10 and 15 years. Thus, with a 33-year life expectancy, it is reasonable to believe that plaintiff will require replacement, the cost of which may be measured by the expenses of the original surgery.

With respect to future loss of earnings, plaintiff testified that she had pain when she did a normal amount of housework; that she was unable to do heavy work and could walk only short distances; that her right leg is shorter than her left leg, which requires a shoe built up with the heel and sole higher than the other shoe. Prior to her injury, she was earning about $140 per week and, although not employed at the time of the occurrence here, she was in the process of seeking employment and had made application for various types of employment. Her only vocational training was that of a structural assembler for aircraft, which was her work before the accident. She testified that her physical condition prevented her from doing that kind of work, because it required her to be on her feet and to do a considerable amount of lifting. She also had some experience as a retail clerk, but this work also required her to be on her feet for long periods of time.

■■ Illinois Pattern Jury Instructions—Civil Nos. 30—06 and 30—07, provide for future medical expense and future loss of earnings as elements of plaintiff's compensable damages, and she is entitled that they be submitted to the jury where the evidence justifies their use. We believe that the evidence outlined above was sufficient to justify the giving of this instruction, and we find no basis in fact or in law to support defendant's contention that it was error to give it. See *Martin v. McCarry*, 2 Ill.App.3d 650, 275 N.E.2d 897; *Redmond v. Huppertz*, 71 Ill.App.2d 254, 217 N.E.2d 85.

## II.

Defendants next contend that the trial court erred in refusing to direct a verdict for them or to enter judgment notwithstanding the verdict. They argue that their immobile vehicle was merely a condition which did not constitute a proximate cause of the accident and that Hammer's conduct was the sole cause of plaintiff's injuries, because he was driving too close behind the truck ahead of him and thus was unable to avoid the collision with their vehicle, as the truck ahead of Hammer had managed to do without difficulty.

This court will consider factual questions where it is contended that the trial court's finding is against the manifest weight of the evidence or incorrect as a matter of law. In so doing, however, we are required to view all of the evidence in its aspect most favorable to the plaintiff and then consider whether it so overwhelmingly favors defendants that no contrary verdict, based on that evidence, would ever stand. *Pedrick v. Peoria & E. R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504.

■■ Here, there was testimony that defendants' vehicle was left standing, at night, in a moving lane of traffic in the area of a "No Parking" sign. There was testimony that there were neither reflectors nor lights on the truck nor flares or fuses at the rear thereof. There was, however, testimony from Bowen that emergency flares and truck lights were on. We believe defendants confuse their affirmative obligation to act with reasonable care with their position that the immobility of the truck could only be an object that is acted upon and was not an "operating, efficient or proximate cause" of the injury. It is a fundamental proposition in the law of negligence that there may be more than one proximate cause of an injury and that one is liable for its negligent conduct whether it contributed in whole or in part to a plaintiffs' injury, so long as it was one of the proximate causes of the injury. *Ray v. Cock Robin, Inc.*, 57 Ill.2d 19, 310 N.E.2d 9.

This court had occasion in *Green v. Welts*, 130 Ill.App.2d 600, 604, 265 N.E.2d 188, to consider arguments similar to the ones presented by defendants here. In *Green*, it was held that:

> "Not every intervening act sufficiently insulates that initial wrongdoer from liability. If a resulting injury is a natural and probable result of the original negligent act or omission, and is of such a character that an ordinarily prudent person ought to have foreseen as likely to occur as a result of the original negligent act, even though the precise or exact result need not have been foreseen, then the original negligent act is a proximate cause of the resulting injury."

■■ Reviewing the evidence here in its aspect most favorable to plaintiff, as we are required to do by *Pedrick*, we are unable to say that the conduct of defendants, as a matter of law, was not a proximate cause of plaintiff's injury.

### III.

Defendants next argue that the court incorrectly excluded evidence of Hammer's alleged intoxication. In support thereof, they cite *French v. City of Springfield*, 5 Ill.App.3d 368, 283 N.E.2d 18, which stands for the proposition that one potentially liable for acts of negligence has the

right to establish through competent evidence of intoxication that the conduct of a third party was the sole proximate cause of plaintiff's injury. Here, defendants attempted, by two offers of proof, to establish the alleged intoxication of Hammer; first, through Hammer's testimony that he had six or seven brandy and waters at two taverns, between 7 and 11 P.M., without having anything to eat; and second, through Officer Benson's testimony that after the collision he detected an odor of alcohol and noticed Hammer's speech was slurred or thick and that he walked wobbly and unsure. Benson was not sure, however, that Hammer had been drinking and didn't get close enough to determine whether the odor of alcohol came from Hammer. He also stated there was an odor of leaking automobile antifreeze, and he couldn't tell whether the odor was from the antifreeze or Hammer's breath. Benson also observed that Hammer had a bump on his head and several cuts on his face. He did not charge Hammer with driving under the influence of intoxicating liquor, and he stated that his wobbly condition could have been the result of a head injury he sustained.

■■ The cases have held that it is not enough that the evidence prove only that the allegedly intoxicated person consumed alcohol (*Shore v. Turman*, 63 Ill.App.2d 315, 210 N.E.2d 232); rather, it must also be established that this person consumed alcoholic liquor so that together with evidence of his unusual behavior or opinion evidence it could be said that this person was intoxicated. *Weiner v. Trasatti*, 19 Ill.App.3d 240, 311 N.E.2d 313.

Considering then, as we must, that the admission of evidence rests largely in the discretion of the trial court, whose decision should be reversed only when such discretion has been clearly abused (*Trippel v. Lott*, 19 Ill.App.3d 936, 312 N.E.2d 369), and considering also the nature and content of the offers of proof outlined above, we conclude that no abuse of discretion appears here. We believe that the questionable nature of the officer's testimony concerning intoxication and the possible introduction of inadequate evidence of intoxication, which would be highly prejudicial, were valid reasons, within the court's discretion, to exclude this evidence.

## IV.

Defendants' final contention is that the court erred in dismissing, on motion before trial, their third-party action against Hammer, which sought indemnity based on the active-passive negligence theory. Defendants seemingly equate immobility with passivity. For purposes of indemnity, this conclusion has no merit. As this court noted in *Moody v. Chicago Transit Authority*, 17 Ill.App.3d 113, 117, 307 N.E.2d 789:

"Determination of this question is not a matter of proceeding according to the usual dictionary definitions of the words 'active' and 'passive'. These words are terms of art and they must be applied in accordance with concepts worked out by courts of review upon a case by case basis. Under appropriate circumstances, inaction or passivity in the ordinary sense may well constitute the primary cause of a mishap or active negligence [citation]. It has been appropriately stated that 'mere motion does not define the distinction between active and passive negligence.'"

■■ We have reviewed the record to detemine whether the necessary difference in the degree of culpability exists here to warrant the shifting of the entire burden from one tort-feasor to the other (*Reynolds v. Illinois Bell Telephone Co.*, 51 Ill.App.2d 334, 201 N.E.2d 322), and we have concluded that the negligence of defendants cannot be characterized as passive so as to permit a transfer of the responsibility from them to Hammer for injuries to which they contributed. See *Carver v. Grossman*, 55 Ill.2d 507, 305 N.E.2d 161.

Additionally, a third-party complaint must disclose a pretort relationship upon which a duty to indemnify may be predicated. (See *Muhlbauer v. Kruzel*, 39 Ill.2d 226, 234 N.E.2d 790.) No such relationship between defendants and Hammer is alleged here.

For these reasons, we conclude that it was not error to dismiss defendants' third-party action.

For the reasons given, the judgment is affirmed.

Affirmed.

DRUCKER and LORENZ, JJ., concur.